**Sharon Lee LONG, Plaintiff–Appellant,**

v.

**LARAMIE COUNTY COMMUNITY COLLEGE DISTRICT; Rodney Southworth; Richard Williams; Robert Schliske; Harlan Heglar, Defendants–Appellees.**

No. 84–2382.

United States Court of Appeals, Tenth Circuit.

Feb. 23, 1988.

Richard C. LaFond of LaFond & Evangelisti, Denver, Colo. (Jay Dee Schaefer, Schaefer & Newcomer, Laramie, Wyo., was also on the brief), for plaintiff-appellant.

Craig Kirkwood (Kennard Nelson of Kirkwood, Copenhaver & Nelson, Laramie, Wyo., was also on the brief), for defendants-appellees.

Before HOLLOWAY, Chief Judge, and McWILLIAMS and McKAY, Circuit Judges.

HOLLOWAY, Chief Judge.

Plaintiff-appellant Sharon Lee Long, a former part-time instructor in computer science, brought this action against defendants-appellees Laramie County Community College District and several of its administrators and employees. Long seeks declaratory and injunctive relief and back pay under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, for alleged disparate treatment resulting from sexual harassment and retaliatory treatment. She also seeks compensatory and punitive damages under 42 U.S.C. §§ 1983, 1985 and state common law tort theories. Plaintiff appeals the trial court's judgments in favor of defendants-appellees.

## I

### A. *The factual background*

The record reveals the following evidence relevant to this appeal:

Defendant Laramie County Community College (LCCC) hired Sharon Lee Long in August 1977 after she had responded to a newspaper advertisement placed by LCCC. At the time she applied, Long had a high school diploma, three and one half months of training with International Business Machines, Inc. and a few accounting and computer courses through community colleges. She had no college degree and she took no additional courses while at LCCC. The chairman of the business division, defendant Richard Williams, interviewed Long and offered her a contract to teach an introductory business data processing class part-time in the fall semester of 1977, which Long accepted. Long was employed on a semester by semester basis.

After the spring of 1979 LCCC employed defendant Rodney Southworth as its first full-time computer instructor. Long testified that Southworth was her immediate supervisor and that he controlled her scheduling and assignments; Southworth denied being her supervisor and disputed her testimony on his authority over her.

Long's courseload temporarily declined in 1979 when Southworth started as a full-time instructor. When he began teaching higher level courses in the spring of 1980, Long's courseload again increased. The parties stipulated that from the fall of 1977 through the spring of 1981, Long performed her duties capably and competently and she received positive input about her job performance. XXIV R. pl. ex. 2 at 2–3; VI R. 11.

Long testified that in 1979 and 1980 Southworth and at least one student told her that Southworth was sexually involved with female students. VI R. 19–20. At trial Southworth admitted having affairs with one H. and one other student in the fall of 1979 and the spring of 1980. X R. 370–372. Although Long did not initially report these allegations, by October 1980 she testified that Southworth's sexual involvements were beginning to affect her career and relationships with students and peers. XI R. 20.

Long had a dispute with H., who was a member of the LCCC student chapter of the Data Processing Management Association, a group interested in data processing for which Long was faculty advisor. After a business portion of an October 17, 1980 meeting, Long testified that she called Southworth into the hall and "asked him to please get his girlfriends in line," as they were affecting her professionally. Southworth became angry and protested her going to his wife, the Board of Trustees or defendant Williams with her accusations.

There was a further incident between Long and Southworth on October 24, 1980. Long testified that she met Southworth in his office and that he leaned over and put his hands on hers and said: "I'm really sorry, but I've been neglecting you lately, Sharon. If you want to spend some special time with me, I'm sure we can make everything fine. The students don't mean much to me. Let's just find some extra time to spend together by ourselves." Long interpreted the remarks as a sexual advance and left Southworth's office. XI R. 23; IV R. 2264. About a month later, Long testified that Southworth made a similar statement when she met him at a local bar to discuss their deteriorating working relationship. Long said that Southworth told

her that if she would make apologies for some untruths about him, he would see to it that she had the same number of classes to teach in the spring of 1981 as she had in the fall and that he would take her away and they would "spend a lot of time together." She interpreted these remarks again as a sexual advance and threat, and left this meeting in tears. IV R. 2264; VI R. 25.

Southworth disputed Long's version of these meetings directly. He said that in the office meeting he had told Long he hoped they could communicate effectively and denied the remarks interpreted as a sexual advance. Southworth denied making any representations at the off-campus meeting about Long's teaching load and testified he was in no position to determine her workload. X R. 382–89.

Long testified that after she told Southworth she did not want an affair with him, he and others at the college made special criticisms of her job performance, which she had not had before. Long testified that she learned from class schedules that the college did not rehire her to teach in the summer or fall semesters of 1981. Southworth was not speaking to her at this time and defendant Williams would only speak with her when his secretary was taking notes. VI R. 36–38. Again, the defendants' versions of these events differed sharply with Long's statements. While Long said she had raised Southworth's sexual harassment of her and the students at November and December 1981 meetings, defendants Williams, Schliske and Heglar all testified that the meetings did not involve Southworth's alleged sexual harassment of her. XI R. 573, 661; XII R. 755.

There was testimony that in February 1981 there was a meeting of Southworth with Heglar and Schliske. Southworth first denied any involvement with students, but when he was told that someone had reported such an involvement, Southworth admitted having a sexual relationship with one employee, but denied relationships with others. X R. 390–91. Southworth had a relationship with one other student, according to some testimony. X R. 370, 45. The college staff placed Southworth on probation and told him that if he had any sexual involvement with students or committed other improprieties, he would be discharged. Southworth testified that he lived up to the terms of his probation. X R. 392, 404.

The defendants testified there were non-discriminatory reasons for the reduction of Long's teaching load and their decision later not to re-employ her at all. LCCC hired a second full-time instructor in the spring of 1981 for the computer science program. Williams testified that this employee's presence and a normal decline in the demand for courses in the spring of 1981 accounted for a second reduction of Long's courseload from five to two courses in the spring of 1981. Defendants also presented evidence that LCCC did not offer a teaching contract to Long during the 1981 summer session because she had taught two courses in the spring while a better qualified instructor was available and requested one course. Under a new rotation policy, Long was not allowed to teach summer classes in order that the other instructor could teach two courses during that session. Lastly, the decision not to employ Long in the fall of 1981 was based on the availability of more qualified part-time instructors, on the improvement in the data processing program, on the lack of improvement in Long's qualifications, and on the fact that Long had started some rumors and had a poor relationship with defendant Williams and a lack of communication with the remainder of the faculty. XI R. 526–27.

Long contacted a Cheyenne, Wyoming law firm concerning her problems at the college. An intern there investigated and made a report. With Long's approval, the LCCC Board of Trustees treated the report as an administrative grievance under the administrative grievance procedures of the college and the Wyoming Administrative Procedure Act, Wyo.Stat. §§ 16–3–101 to 16–3–115.

A college Grievance Committee hearing was held and the committee made findings and recommendations. Under the school's

procedure, findings and decisions of the Board of Trustees of the college followed after review of the committee findings and recommendations. The Board found that those named as parties against whom the grievance was submitted included Rodney Southworth, Dean Schliske, Mr. Williams, Division Chairman, and Dr. Heglar, President of the College, and the College itself. The Board found that a hearing had been held before the Committee. An attorney appeared for Long and another attorney entered an appearance on behalf of all the respondents except Southworth, who represented himself. Testimony was taken for approximately 18 hours and transcribed.

The Board found that there was a basis for the claimed grievance by Long. The Board recognized that sex discrimination is an employment practice in which an employer or his agents discriminate on the basis of sex; that sexual harassment is a form of sex discrimination; and that sexual harassment is any behavior, unwelcome or unsolicited, verbal or physical, which imposes a requirement of sexual cooperation as a condition of employment or advancement; and that sexual harassment may range from innuendo to coerced sexual relations.

The Board considered that professional harassment is conduct which has the purpose of affecting or substantially interfering with an individual's performance and/or creating an intimidating, hostile or offensive working environment. The Board found that the administrative record supported the findings of the Grievance Committee that Southworth sexually harassed Long and professionally harassed Long as well; that Long sought redress with various agents of the college for such harassment; and that she received retaliatory action from agents of the college and, as a result, was not re-employed by the college.

The Board entered legal conclusions and a decision that the college should reinstate Long in a position, appropriate to her education and teaching abilities as of the fall semester of 1982, that the college should repay her back wages of $4,080.00, and

$1,500.00 as a reasonable attorney's fee for the grievance procedure representation. The Board found that a written sexual harassment policy should be presented for consideration by the Board. It found further that should Southworth later be found guilty of sexual harassment of an employee or student at the college, or of professional harassment and/or professional retaliation against an employee of the college he should immediately be subject to notice and discharge by the Board. Pl. Exs. 1 and 15.

In view of more difficulties with the college, Long filed further charges with the Office of Civil Rights of the Department of Education of Wyoming. That office investigated and made findings that the college did not re-employ her as a retaliation for her efforts on behalf of female students who were being sexually harassed. The college offered an agreement about her employment, conditioned on Long's release of further claims for lost compensation or other damages, but she declined to agree to such a waiver. Long filed discrimination charges with the EEOC in February 1982. The EEOC made findings and recommendations and issued a notice of right to sue. The college complied with the recommendations, increasing the back pay, *inter alia.*

### B. *The court proceedings*

Following her refusal to sign the waiver discussed above, Long brought this suit under Title VII and 42 U.S.C. §§ 1983 and 1985, alleging sexual and professional harassment and retaliation for her actions protesting sexual harassment of students and herself. The trial judge bifurcated the trial of the Title VII claim from the § 1983 and § 1985 and pendent claims on his own motion. A non-jury trial of the Title VII claims was held first, without objection by the plaintiff to that procedure. Long claimed at this trial that Southworth had harassed her and various students, that the defendants retaliated when she reported his activities by making her conditions of employment more difficult and ultimately refusing to renew her contract. VIII R. 6–7. Long relied on the findings of the Grievance Committee and the LCCC Board of Trustees as "direct evidence" of sexual

harassment and retaliation, and argued that when she rested, defendants had the burden of proving that they had no discriminatory motive.

The defendants, Southworth, Williams, Schliske, President Heglar and the College, defended first by challenging the credibility of Long and denying her charges. Individual defendants and women whom Southworth allegedly harassed contradicted Long's testimony concerning the facts. Her former husband, Thompson, contradicted testimony of Long in her deposition and at the grievance hearing. He testified he had been discharged from the military in April 1972 and was living in North Carolina, at the time when Long later claimed that she had received notice of his death. He had called and asked her to come to North Carolina to join him. According to Thompson, Long had been in a mental hospital, had been involved in an affair, and her reputation for truthfulness was bad.

The defendants argued that Southworth had not harassed Long; that the college had not engaged in any retaliation against her; and that the college was not obligated to renew her teaching contract. Furthermore it did not renew it because she had not improved her qualifications to keep pace with the computer science program and it was easier to hire others than to continue a "battle" the college considered resolved.

The trial judge found that under *McDonnell–McDouglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Long had failed to establish a prima facie case of sex discrimination because she had failed to prove that Southworth had sexually harassed her or that the college or the individual defendants had retaliated against her. In any event, the judge found that the defendants had articulated legitimate reasons for their failure to offer Long additional employment and that the reasons given by the defendants were not shown to be pretexts for discrimination. The court said that in the *de novo* proceedings it was not bound by the findings of the Grievance Committee or the Board of Trustees which were based on Long's un-

substantiated and uncorroborated version of the facts and that Long's credibility was highly questionable.

After the trial court entered judgment for defendants on the Title VII claims, the defendants moved for summary judgment on the remaining claims, arguing that collateral estoppel precluded Long from relitigating the facts. The court granted summary judgment and this appeal followed.

Long makes three principal arguments on appeal which we consider in Parts II through IV, *infra*.

## II

### *The Title VII trial and findings*

Long argues that the findings and decisions of the Board of Trustees in her favor constituted "direct evidence" of discrimination. In those proceedings all of the defendants in the federal suit had been parties and the final decision of the Board had not been appealed. Long argues that the burden was therefore on defendants to prove by a preponderance of the evidence that discrimination did not occur, and not merely to articulate a reason for the discriminatory conduct complained of. Long says that the trial judge erred by not requiring that the defendants prove by a preponderance of the evidence that they would have decided not to grant her the teaching contract in any event.

The *McDonnell–Douglas* test is "inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985); *Furr v. A.T. & T. Technologies, Inc.*, 824 F.2d 1537, 1549 (10th Cir.1987). However if the factfinder does not credit the plaintiff's direct evidence of discrimination, the *McDonnell–Douglas* mode of analysis still applies. *Terbovitz v. Fiscal Court of Adair County*, 825 F.2d 111, 114–15 n. 1 (6th Cir.1987). If the district court finds that discrimination has been established by the plaintiff's direct evidence, the employer must do more than merely articulate a nondiscriminatory justification and the burden shifts to the employer to prove

by a preponderance of the evidence that the adverse employment action would have been taken even in the absence of the impermissible motivation. *Id.* at 115.

█ However, here the district judge specifically found against the plaintiff on her proffered evidence and did not find that she had established her claims of discrimination and retaliation. The judge said that the proceedings in the Title VII trial were *de novo*, that the court was not bound by the findings of the Grievance Committee, the Board or the EEOC; and that the findings of those agencies were based on plaintiff's version of the facts, unsubstantiated an uncorroborated by any witnesses before the court. Since the judge did not believe the proffered direct evidence, the evidentiary framework of *McDonnell–Douglas* was the proper mode of analysis. *Terbowitz,* 825 F.2d at 115 n. 3.

█ The findings of the trial judge on the Title VII case must be judged under the clearly erroneous standard of Fed.R. Civ.P. 52(a). *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). We are satisfied that the record contains ample evidence, including the testimony of Mr. Thompson, from which the judge could disbelieve Long and credit the defendants' testimony. The Title VII findings rejecting the claims of sexual harassment and retaliation are not clearly erroneous. Moreover the findings that the defendants had presented legitimate reasons for their failure to offer Long additional employment, including a reduced need for part-time faculty and the availability of more qualified and highly trained instructors, were supported by the record. As we discuss below, in the Title VII proceeding the administrative findings were not binding on the court.

In sum, we uphold the findings of the court against Long on her Title VII claim.

### III

#### *The admission of Mr. Thompson's testimony*

Long contends that the trial court erred in admitting the testimony of Mr. Thomp-son, her former husband. More specifically, objection is made to the trial court's permitting him to testify at all because his name did not appear on the witness lists of the defendants.

At the time of trial, then Local Rule 8(e)(3) of the District of Wyoming provided that "[e]xcept for impeachment or rebuttal purposes and absent good cause shown," no witness could testify unless his name and a summary of his testimony appeared on a witness list. This Rule has since been superseded. *See* Local Rules of the District Court for the District of Wyoming, Rule 208(e)(1), (3) (April 12, 1985). The pretrial order further provided that the parties could not call witnesses whose names were not listed unless "at least ten (10) days prior to trial" they provided opposing counsel the names and addresses of the additional witnesses, together with a summary of their expected testimony. III R. 968.

At the close of the first day of trial defendants called Thompson as their first witness, offering his testimony for impeachment purposes. VIII R. 58. The judge recessed trial until the next morning, and at that time Long's attorney moved that the court refuse to allow Thompson to testify because he was not listed on any witness list. Moreover, in view of a stipulation by the parties that Thompson was alive, his testimony would be irrelevant and highly prejudicial under Fed.R.Evid. 403. This latter stipulation was relevant because there had been contradictory statements made by Long in earlier proceedings in which she had stated that she had received notice of Thompson's death.

In response to the objections, counsel for Southworth admitted he knew of this witness some two and a half or three weeks earlier but stated that in view of Long's earlier insistence that Thompson was dead, it was a deception that was being attempted on the court, rather than on the plaintiff. He further argued that he knew that if the witness was listed, some story would be brought up that they would not have

time to rebut and felt it in the best interest of justice not to reveal the name. IX R. 66.

The argument of counsel is wholly unconvincing and inconsistent with the purposes of discovery. The contention harks back to times of surprise achieved through the withholding of witnesses and evidence until a dramatic opportunity for impeachment appeared. That occurred here when Long screamed and fell when Mr. Thompson appeared. Nevertheless, counsel's explanation, admitting a clear violation of the pretrial order offers no support for his position.

■■■ There was no violation of the Local Rule itself because the defendants called Thompson to impeach Long's veracity. However, the language of the pretrial order does preclude Thompson's testimony and the explanation for disregard of the order is untenable. Nevertheless the question before us is whether the trial judge abused his discretion in relieving the defendants from the provisions of the pretrial order.

■■■ The terms of the pretrial order prohibiting the calling of unlisted witnesses did, of course, have binding effect on the parties. *Perry v. Winspur,* 782 F.2d 893, 894 (10th Cir.1986). However, the "trial court may modify the pretrial order during trial to prevent manifest injustice." *Grant v. Brandt,* 796 F.2d 351, 355 (10th Cir. 1986); *see also Patterson v. F.W. Woolworth Co.,* 786 F.2d 874, 879 (8th Cir.1986) ("flexible application of pretrial orders is within the sound discretion of the District Court"); *Hull v. Chevron U.S.A., Inc.,* 812 F.2d 584, 588 (10th Cir.1987).

The trial judge stated that the objection to Thompson's testimony was addressed to the discretion of the court. He was best able to assess the circumstances. He concluded that in the interest of justice the objection should be overruled. IX R. 73. We cannot say that there was an abuse of discretion.

## IV

*The summary judgment for defendants on the claims under §§ 1983 and 1985 and common law tort theories*

Long's remaining argument is that the trial court erred by granting the defendants' motion for summary judgment on the remaining claims under §§ 1983 and 1985 and common law theories. In his order granting summary judgment on those claims the trial judge recounted his written findings and conclusions for defendants on the Title VII claim. The court had found that the evidence failed to show sexual harassment of Long by Southworth. The court had found also that there were no acts of retaliation taken by the college or the other individual defendants against Long. The judge concluded that under collateral estoppel principles, the findings from the Title VII hearing applied with respect to the remaining claims, and that Long had failed to show that there were any remaining material facts to be presented at a second hearing. Having found the facts for the defendants and against Long, the judge held that the defendants were entitled to summary judgment on all the remaining claims.[1]

Long argues that the summary judgment should not have been grounded on the Title VII findings under principles of collateral estoppel. She says that she was entitled to

1. In addition to the Title VII sexual harassment and retaliation claim, the complaint alleges claims under 42 U.S.C. §§ 1983 and 1985(3) for violation of plaintiff's 14th Amendment equal protection rights and conspiracy to violate those rights (counts 2 and 3); negligence against LCCC for failure adequately to supervise the individual defendants and for failure to provide written policies or guidelines for handling sexual harassment cases (counts 4 and 5); negligence against Heglar, Schliske and Williams for failing adequately to supervise Southworth and for participating in his harassment of plaintiff (count 6); intentional infliction of emotional distress against Southworth for harassing plaintiff (count 7); intentional infliction of emotional distress against Williams, Schliske and Heglar for retaliating or acquiescing in retaliation against plaintiff (counts 8 and 9); defamation against Southworth for statements he allegedly made to harass plaintiff (counts 10 and 11); and interference with contractual relations against Southworth, Williams, Schliske, and Heglar for their actions which allegedly led to plaintiff's termination (count 12). I R. 8–21.

a jury trial on fact issues which remained after the trial court found against her on her Title VII claim and that the initial Title VII trial was not a full and fair opportunity to litigate the remaining claims.

For reasons given later we agree that summary judgment in favor of Southworth and the college must be reversed. We do not, however, accept the arguments that Long has made against any application of the findings from the Title VII proceedings with respect to the remaining claims. Long made a timely demand for a jury trial on these remaining claims, but she did not object to the *de novo* trial by the judge of the Title VII claim first.[2] Long argues, albeit with respect to the discussion of Part II above, that the final decision of the Board of Trustees presented "direct evidence" of discrimination. Long further makes a general argument that the summary judgment against her remaining claims was error. Considering these broad contentions and the Court's holding in *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), we agree that the summary judgment as to the defendants was in error.

In *Elliott* the Court held that findings of fact in unreviewed administrative proceedings do not have preclusive effect by collateral estoppel in Title VII cases, but that they do have preclusive effect in § 1983 and other proceedings. The scope of the preclusive effect of the administrative findings was defined in *United States v. Utah Construction and Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). In *Elliott* the Court stated: ... Accordingly, we hold that when a state agency "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." *Utah Construction & Mining Co., supra*, at 422, 86 S.Ct. at 1560, federal

courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts. 478 U.S. at ——, 106 S.Ct. at 3227.

With respect to the test stated in *Elliott*, we are satisfied that the Board of Trustees and the Grievance Committee acted in a judicial capacity in the determinations made with respect to Long's claims. The hearing was conducted pursuant to regulations of the college which it had authority to promulgate under Wyo.Stat. § 21–18–304. The hearing was also conducted in accordance with the Wyoming Administrative Procedures Act. The parties were all represented by counsel except Southworth; he was offered counsel by the college but instead chose to represent himself at the grievance proceedings. Witnesses were examined and crossexamined and documentary evidence was introduced. Thereafter the Grievance Committee made its findings and recommendations which were reviewed by the Board of Trustees and it then entered its own findings, conclusions and decision. We feel that the administrative agencies acted in a judicial capacity within the meaning of *Elliott. See Buckhalter v. Pepsi–Cola Gen. Bottlers, Inc.*, 820 F.2d 892, 896 (7th Cir.1987); *Yancy v. McDevitt*, 802 F.2d 1025, 1029 n. 2 (8th Cir.1986).

It is clear that the Board resolved disputed issues of fact which had properly been before it. *Buckhalter*, 820 F.2d at 896. We are convinced that the requirements of *Elliott* for the application of collateral estoppel in the § 1983 and § 1985 proceedings were met.

Since the *Elliott* requirements were met, the findings of the Board and the Grievance Committee were entitled in the proceedings under §§ 1983 and 1985 to the same preclusive effect that they would have carried in the Wyoming courts.[3] *El-*

---

**2.** No argument is made under *Woods v. Dairy Queen*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) or *Beacon Theatres v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), that the order of the trial on the Title VII claim denied Long her right to trial by jury.

**3.** We realize that giving such preclusive effect to the Board's findings in the § 1983 and § 1985 proceedings produces results at odds with the denial of preclusive effect to those findings in the Title VII proceedings. The inconsistency was noted in the dissent of Justice Stevens in *Elliott*, 478 U.S. at —— n. 1, 106 S.Ct. at 3227 n.

*liott,* 478 U.S. at —, 106 S.Ct. at 3222. In Wyoming, collateral estoppel "involves the preclusion of issues which were actually decided in prior litigation of a different claim or cause of action between the parties." *Rialto Theatre v. Commonwealth Theatres, Inc.,* 714 P.2d 328, 336 (Wyo. 1986). Wyoming employs the doctrine of collateral estoppel to promote finality, reliance by parties on courts to settle disputes, and to conserve judicial resources. *Id.* These interests would be served by giving preclusive effect to the unappealed agency findings. Under Wyoming law we believe the findings of the Board would be given preclusive effect.

■ We must consider now whether giving such preclusive effect to the Board's findings requires reversal of the summary judgment for Long. The parties before the Board included Williams, Schliske and Heglar, college officials, and the college. The Board found that the record "supports the findings of the Grievance Committee that Sharon Long sought redress with various agents of the college for the aforesaid harassment and that in the process she received retaliatory action from agents of the college, and that, as a result, she was not re-employed by the college." This finding is most reasonably interpreted as adverse to Williams, Schliske Heglar and the college on the federal claims against them. However a theory of liability under federal law for retaliatory conduct by these four defendants does not give rise to a viable claim under § 1985, and instead supports only a Title VII claim. *Great American Federal Savings & Loan Ass'n. v. Novotny,* 442 U.S. 366, 378, 99 S.Ct. 2345, 2352, 60 L.Ed.2d 957 (1979). Nor does such a theory of liability for retaliatory conduct come within § 1983. *Meade v. Merchants Fast Motor Line, Inc.,* 820 F.2d 1124, 1125 n. 1 (10th Cir.1987); *Tafoya v. Adams,* 816 F.2d 555, 557–58 (10th Cir.) *cert. denied,* — U.S. —, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987). In sum, we hold that the summary judgment was proper in favor of Williams, Schliske, Heglar and the college on the federal claims for retaliation asserted under §§ 1983 and 1985.

■ However, with respect to claims against these four defendants (Williams, Schliske and Heglar and the college), under §§ 1983 and 1985 for allegedly improper supervision and control of Southworth and for acquiescence, resulting in constitutional wrongs, and with respect to the pendent state law claims for infliction of emotional distress, negligence and the like, we are not satisfied that these four defendants have demonstrated that there is no genuine issue as to any material fact pursuant to Fed.R.Civ.P. 56(c), particularly in light of the Board's findings which are evidence adverse to these defendants. Thus the summary judgment pertaining to these federal and pendent claims against these four defendants is reversed and those claims are remanded for further proceedings in the district court. On remand there should be a determination whether valid constitutional claims against these four defendants on such grounds exist.

■ Since the administrative findings were made first and are to be considered in connection with the pendent state law claims and any constitutional claims, we feel that the trial court erred in granting summary judgment in favor of Williams, Schliske, Heglar and the college. The judge's reason for doing so was that he made *de novo* findings which he relied on in the Title VII suit. He was entitled to do so in that trial. Nevertheless under *Elliott* and Wyoming law the administrative findings of sexual harassment by Southworth and of action by the agents of the college must be considered. They do not establish liability per se but they are evidence, along with the conflicts in testimony, which show that it was error to grant the summary judgment. We therefore reverse the summary judgment in favor of the four defendants and remand the claims against them for further proceedings, except the § 1983 claim for retaliation which may not be maintained in light of the *Tafoya* opinion.

1. Nevertheless the difference in treatment of the findings is required by *Elliott.*

Lastly, we turn to Long's claims against Southworth. There was a clear dispute in the testimony concerning his conduct toward Long and concerning his supervisory status over her. Moreover the Board's findings that he did sexually and professionally harass her were the first findings made and they are entitled to consideration in the proceedings against Southworth on Long's constitutional and pendent state law claims. Again, it was not demonstrated by Southworth that there was no genuine issue as to a material fact and the summary judgment on the claims is reversed and they are remanded for further proceedings.

## V

### Conclusion

In conclusion, we affirm the judgment for defendants on the Title VII claim. We likewise affirm the summary judgment in favor of defendants Williams, Schliske, Heglar and the college district with respect to Long's claims under §§ 1983 and 1985 for retaliatory conduct. We reverse the summary judgment as to those defendants on the pendent state law claims for negligence, emotional distress and the like, and under §§ 1983 and 1985 on the sexual harassment theory. On remand, it should be determined whether the actions of Southworth, Williams, Schliske and Heglar amounted to any constitutional violations sufficient for liability under §§ 1983 and 1985, by them and the college, except the claim for retaliatory conduct which the *Tafoya* ruling bars.

IT IS SO ORDERED.